UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SUSAN KAYE WINKELSPECHT,

   Plaintiff,

 v.               Case No. 10-C-1072

GUSTAVE A. LARSON COMPANY, UNUM
LIFE INSURANCE COMPANY OF AMERICA,
and GUSTAVE A. LARSON CO. PLAN,

   Defendants.

---

**DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

---

This ERISA case is about a mix-up over life insurance that unfortunately came to light only after the putative insured died. It is presently before the Court on cross motions for summary judgment. For the reasons that follow, Plaintiff's motion for summary judgment will be granted as to her estoppel claim against the employer and the plan, but denied as to the insurer.

**BACKGROUND**

Harry Winkelspecht, as an employee of Defendant Gustave A. Larson Company (GALCO), was insured under a group life insurance policy issued by Defendant Unum Life Insurance Company of America (Unum), a benefit GALCO provided its employees under the Gustave A. Larson Company Plan, an employee welfare benefit plan governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq. GALCO paid the full cost of basic life insurance for active employees, which paid a benefit of 1.5 times the employee's salary upon his or her death.

For Winkelspecht, this amounted to $103,000. Mr. Winkelspecht listed his wife, Plaintiff Susan Winkelspecht, as his beneficiary.

The policy contained a "portability" provision which allowed the employee to "port" group life coverage to individual life coverage upon termination of his employment. In pertinent part, the Summary Plan Description (SPD) stated:

> **WHAT COVERAGE IS AVAILABLE IF YOU END EMPLOYMENT OR YOU WORK REDUCED HOURS? (Portability)**
> If your employment ends or you retire from your Employer or you are working less than the minimum number of hours as described under Eligible Groups in this plan, you may elect portable coverage for yourself and your dependents.
> . . .
>
> **APPLYING FOR PORTABLE COVERAGE**
> You must apply for portable coverage for yourself and your dependents and pay the first premium within 31 days after the date:
> - your coverage ends or you retire from your Employer;
> or
> - you begin working less than the minimum number of hours as described under Eligible Groups in this plan.

(Am. Compl., Ex. A at 30–31.)

Mr. Winkelspecht retired on January 1, 2008, after thirty-five years with GALCO. Prior to his retirement, Mr. Winkelspecht spoke with Doreen Raebel, a temporary employee who served as the Administrator of Payroll and Benefits for GALCO, about continuing his life insurance coverage under the Unum policy. The undisputed evidence reveals that Ms. Raebel informed Mr. Winkelspecht that his coverage would continue and that the premium would continue to be paid by GALCO. On January 7, 2008, Mr. Winkelspecht emailed Ms. Raebel, inquiring in part: "You told me the life insurance would continue company paid correct?" On January 8, 2008, Ms. Raebel sent a return email to him, stating, in relevant part, "Yes, your life insurance benefit of 1.5 times your

2

base salary will continue to be paid by GA. Larson as well." (PPFOF ¶ 10.) Unfortunately, GALCO did not continue paying the premium, and because he did not apply to continue it, the coverage under the Unum policy terminated with his retirement.

Mr. Winkelspecht died on October 28, 2009, approximately eighteen months after he retired from GALCO. Shortly thereafter, Plaintiff's daughter, Jodi Yaeso, discovered the aforementioned email exchange in a safe in the Winkelspechts' home basement, tucked inside the SPD booklet describing Mr. Winkelspect's benefits. Portions of the Plan SPD relating to the Portability Benefit had been highlighted. (PPFOF ¶ 11.) Based on this email, Ms. Yaeso sent an email to Susan Klein at GALCO, stating in relevant part:

> Dad mentioned a life insurance policy through Larson's that sounded to me like a group life plan, which he carried after retirement. That one I have not found anything specific for as far as a policy. I found benefit plans and information regarding short term disability and life, etc… but nothing specific on phone numbers or contacts for claims etc… He had notes in his financial file about it being 1.5 times his base salary, but not sure if that dropped in amount after he retired or not? They have a mortgage balance of $70,000 which is what those funds would have covered for mom if he passed. Can you help me learn anything more about this or where I might find details on it? I did contact the funeral home yesterday for more details on Northwestern Mutual (NML) thinking perhaps that was it. They told me a Dave Fritz had called for death certificate copy out of the Milwaukee office of NML. I called his office and spoke with an assistant who said there was a policy on dad for a face value of over $400,000 but payable to GA Larson Co and not the family. Perhaps that was a key employee plan or something else, I am not sure but it did not sound like this was the policy dad was thinking of as the amount is far larger than expected? If there is someone else at the Larson Co I need to speak with please let me know that too and I can take less time from you.

(PSPFOF ¶ 3.)

On November 18, 2009, Ms. Klein responded by forwarding an email she had received from Jill Ziegelbauer, GALCO's then-Administrator of Payroll and Benefits, which stated, "I spoke with

3

policy services at UNUM and there are no policies in force for Wink. He did not continue anything." (PSPFOF ¶ 4.) On November 24, 2009, Ms. Yaeso sent an email to Ms. Ziegelbauer, stating:

> Here is one of the emails I found from dad!! It mentions the life policy which is confusing. . . . Bottom line is dad thought he kept a policy to cover their mortgage balance and that is $67,483.26. If you think I need to email Scott and Susie to follow up on this, just let me know. Again this is so hard to understand when I can't ask him questions or specifics, but thanks for all of your help!

(PSPFOF ¶ 5.) Ms. Yaeso also attached to her email a copy of the January 2008 exchange between Decedent and Raebel.

On November 24, 2009, Ms. Ziegelbauer emailed Ms. Klein:

> I asked Jodi to send me what she was looking at that made her believe her father still had life insurance. She sent the attached emails that were between Doreen and Wink. It says the company will continue to pay for 1.5 times salary life insurance. I don't know why she would have said this. Does this make sense to you . . . are you aware of some kind of agreement made? The company should not have been able to continue this through the group plan so I doubt it and I checked his file and don't see anything in his file.
>
> Jodi wants some follow up since she anticipated this would pay the balance on the mortgage. I thought I'd run it by you so it doesn't become one of those "but I have it documented things." How do you think we should handle. . . . Just say she made a mistake?

(PSPFOF ¶ 6.)

Ms. Klein responded via email on November 25, 2009, saying, in relevant part: "I have no idea why Doreen would have put this in an email — there is no coverage after termination because he's no longer part of a 'group.'" (PSPFOF ¶ 7.) Ms. Ziegelbauer then responded to Ms. Yaeso on November 25, 2009, stating:

> Susie agrees that your father would not have had coverage paid by the company after he terminated. Because he would no longer be an active employee he would not be

4

eligible for coverage under our group plan. I am attaching a copy of our group policy so you can see the terms of the contract.

(PSPFOF ¶ 7.) GALCO, throughout this correspondence, failed to provide Ms. Yaeso with information as to how to file or further pursue a claim for benefits.

After this email, Ms. Yaeso contacted Unum directly and spoke to an Unum representative named "Alison" who informed Ms. Yaeso that Unum could not tell her whether her father was insured through the GALCO Plan because GALCO did not provide Unum a list of employees. (PSPFOF ¶ 8; Yaeso Dep. 44–45.) Again, Unum did not provide information as to how to file a claim for life insurance benefits. Unum instead referred Ms. Yaeso back to GALCO. On December 8, 2009, Ms. Yaeso again emailed Ms. Klein:

> I just wanted to follow up again on this life insurance policy for dad, as I have still continued researching it for mom. I received a return phone call from an agent with UNUM who told me that the Group policy for GA Larson is not one that lists on her end each specific employee and so she would not even see dad in her information but that Larson Co themselves manage that group internally and so coverage is directed by your office. I tried to locate Doreen herself as well to see if she remembered the emailed conversations with dad, but then not sure that would be appropriate either. I was not sure whether to reach out to Jill or yourself and was somewhat concerned by Jill's email below referring to a "documented thing" and what to tell me I was able to find out from UNUM that the cost of dad's continued insurance would have been $2.22 per $1000 of coverage and we used a base salary of $65,000 annually to get a monthly premium of $226.44 for dad, which they certainly could afford to continue and would do so with a mortgage balance per mom since they were doing the same with her policy. Lastly, if indeed there was not coverage for dad as he had thought per his conversations with Doreen, do you think my writing a request to Scott or perhaps Carl to distribute some of the key employee benefit they received in excess of $400,000 to pay mom's mortgage balance would be appropriate?

(PSPFOF ¶ 9.) Ms. Klein forwarded Ms. Yaeso's email to Scott Larson for review. (PSPFOF ¶ 10.) On December 10, 2009, Mr. Larson asked Ms. Klein whether she had spoken to Ms. Yaeso. (PSPFOF ¶ 11.) Ms. Klein emailed him back the same day:

> Yes, I did — this morning. She asked about approaching you and I just said "no." She talked again about the misinformation from Doreen — and I said I was surprised that Wink didn't call me, and if he did I certainly would not have said that group insurance continues — company paid. I think (?) the situation is closed. Time will tell.

(PSPFOF ¶ 12.)

Ms. Yaeso emailed Mr. Larson on December 18, 2009, outlining the situation and requesting that GALCO rectify the matter by paying approximately $60,000 on the mortgage on the Winkelspecht home. Mr. Larson never responded to this email. (PSPFOF ¶ 13.) GALCO instead suggested Ms. Yaeso investigate filing an insurance claim with Remedy Staffing, the temporary service that provided Ms. Raebel to GALCO. (PSPFOF ¶ 14.) In addition, in March 2010, GALCO filed a claim with Traveler's Insurance to determine whether coverage existed under its own liability policy. (PSPFOF ¶ 15.)

Mr. Larson agreed to speak with Ms. Yaeso in April 2010. During this conversation, which included Ms. Klein, Larson expressed GALCO's belief that Ms. Raebel made a mistake, that it did not believe there was a claim to be made against GALCO, and that there was no liability insurance to pay for Ms. Raebel's mistake. (PSPFOF ¶ 16.) Ms. Klein also informed Ms. Yaeso GALCO had consulted an attorney who felt there was nothing "that needed to be done." (PSPFOF ¶ 17.) Again, neither Mr. Larson nor Ms. Klein provided Ms. Yaeso with Unum claim forms, nor did they urge her to contact Unum so she could file a formal claim.

On April 29, 2010, GALCO's attorney sent Ms. Yaeso a letter outlining his firm's analysis of the potential claims for life insurance benefits she could assert on her father's behalf. The letter concluded: "we do not believe there is any legal basis on which you could recover unpaid basic life insurance benefits from GALCO. If you have any questions about anything in this letter, please feel

6

free to call me . . ." (PSPFOF ¶ 18.) Again, the letter said nothing about filing a claim with Unum. Plaintiff then proceeded to file this suit in November 2010.

In her amended complaint, Plaintiff has asserted claims for estoppel, breach of fiduciary duty and wrongful denial of benefits against GALCO, Unum and the Plan. All parties have moved for summary judgment. Based on the undisputed facts before me, I conclude that Unum is entitled to summary judgment because Mr. Winkelspecht was not insured under its policy at the time of his death and there is no basis to hold Unum liable under Plaintiff's theories of estoppel or breach of fiduciary duty. As to Plaintiff's claims against GALCO and the Plan, I conclude that Plaintiff is entitled to summary judgment on her claim of estoppel. Although I also conclude that GALCO breached its fiduciary duty, Plaintiff has not identified any type of equitable relief that might be available. Summary judgment is therefore denied as to that claim.

## ANALYSIS

**A. Exhaustion Of Administrative Remedies**

GALCO and Unum first argue that Plaintiff's claims must be dismissed because she failed to exhaust her administrative remedies before filing her lawsuit. The general rule is that before commencing an action for benefits due under an ERISA plan, a beneficiary must exhaust the plan's administrative remedies. *Powell v. AT&T Communications, Inc.*, 938 F.2d 823, 825–26 (7th Cir. 1991); *Stark v. PPM American, Inc.*, 354 F.3d 666, 671 (7th Cir. 2004); *Zhou v. Guardian Life Ins. Co. of America*, 295 F.3d 677, 679 (7th Cir. 2002). Exhaustion is favored because the plan's review process may resolve a number of issues; the facts and the administrator's interpretation of the plan may be clarified. *Stark*, 354 F.3d at 671.

The decision to require exhaustion as a prerequisite to bringing suit, however, is a matter within the discretion of the trial court. *Salus v. GTE Directories Serv. Corp.*, 104 F.3d 131, 138 (7th Cir. 1997). An ERISA plaintiff's failure to exhaust administrative remedies may be excused where there is a lack of meaningful access to review procedures, or where pursuing internal plan remedies would be futile. *See Stark*, 354 F.3d at 671; *Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1236 (7th Cir. 1997); *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 402 (7th Cir. 1996); *Smith v. Blue Cross & Blue Shield United of Wis.*, 959 F.2d 655, 658–59 (7th Cir. 1992). Here, both exceptions apply.

Ms. Yaeso, acting on behalf of Plaintiff, contacted GALCO and Unum to learn more about the possibility of recovery and how she might go about making a claim. She was repeatedly told she would not be able to prevail on the claim and not one of the representatives — either from GALCO or Unum — suggested that she needed to file a formal claim through Unum. Indeed, not only did they fail to inform her of the requirement that she file a claim and how to do so, both made it clear that it would be futile for her to do so since her father was not insured under the Unum policy at the time of his death. Under these circumstances, Plaintiff's failure to exhaust is immaterial.

## B. GALCO

### 1. Estoppel

Plaintiff asserted a claim against GALCO for estoppel. Estoppel claims are not favored in ERISA litigation. *Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 636 (7th Cir. 2007). This is because the typical estoppel claim seeks a modification of the terms of the plan to provide benefits beyond those expressly set forth in the plan documents. ERISA plans must be in writing, 29 U.S.C.

§ 1102(a), and to allow their terms to be modified by oral representations of those charged with administering them would undermine the goals of insuring uniform application and safeguarding their actuarial soundness. *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999). Nevertheless, the Seventh Circuit has recognized that estoppel is available as a remedy to plaintiffs in extreme circumstances who can establish the following four elements: (1) a knowing misrepresentation; (2) made in writing; (3) reasonable reliance on that representation by them; (4) to their detriment. *Pearson v. Voith Paper Rolls, Inc.*, 656 F.3d 504, 509 (7th Cir. 2011); *Kannapien*, 507 F.3d at 636; *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 639 (7th Cir. 2004). This is such a case.

Unlike most estoppel claims in the ERISA context, Plaintiff's claim does not seek a modification of the plain language of the plan. Much of the parties' briefing is devoted to the question of whether the summary plan document (SPD) was sufficiently clear as to what was required in order to continue or "port" coverage under the policy. But the representation made by GALCO's benefit specialist went not to the meaning of the SPD; it went to action the company was going to take with respect to Mr. Winkelspecht's apparent request to continue his coverage under the Unum policy. By telling Mr. Winkelspecht that his Unum coverage would remain in effect and the company would continue to pay the premium, Ms. Raebel was not providing an interpretation of the policy; she was assuring him of GALCO's intent.

Despite this fact, GALCO argues that the SPD made clear to Mr. Winkelspecht that in order to retain his life insurance with Unum he had to apply for portable coverage and pay a premium within 31 days. Regardless of what Ms. Raebel told him, GALCO argues, Mr. Winkelspecht should have known that he had to apply to Unum and pay a premium within 31 days. But the SPD does

9

not say how the employee applies; nor does it say that the employer cannot continue to pay the premium. Since he initially obtained the insurance through GALCO, Mr. Winkelspecht could have reasonably thought his discussion with Ms. Raebel about continuing it constituted an application, and her assurance that the company would continue to pay for it would have relieved him of any sense of obligation to pay the premium himself. Ms. Raebel's representation that the company would pay the premium is not unreasonable in light of the fact that GALCO apparently did decide to continue paying the premium on its own life insurance policy on Mr. Winkelspecht. By responding to Mr. Winkelspecht's inquiry about his life insurance by telling him that his coverage would continue and GALCO would continue paying the premium, Ms. Raebel led him to believe that no further action on his part was required.

GALCO also argues that Plaintiff's estoppel claim fails because Ms. Raebel did not make a knowing misrepresentation to Mr. Winkelspecht. In GALCO's view, "an intent to deceive is an essential element" to an estoppel claim. (GALCO Br. In Supp. of Mot. for S.J., ECF No. 30 at 11.) Since Ms. Raebel simply made a mistake, GALCO contends, Plaintiff's claim must fail.

GALCO overstates the *mens rea* requirement for equitable estoppel. Although the precise state of mind that is required to support a claim for estoppel in the ERISA context is not entirely clear from the cases, an intent to deceive would not seem to be an essential element. Intent to deceive would establish fraud, not estoppel. The Seventh Circuit has stated that there must be "a knowing misrepresentation" to prevail on an estoppel claim. *Pearson*, 656 F.3d at 509; *Kannapien*, 507 F.3d at 636; *Vallone* 375 F.3d at 639. But it has not clearly defined what a knowing misrepresentation is.

In *Bowerman v. Wal-Mart Stores, Inc.*, the court affirmed a district court's finding that the plan administrator was equitably estopped from denying coverage for medical benefits based on misleading plan documents and inaccurate information given to the plaintiff employee by a benefits administrator. 226 F.3d 574, 587–90 (7th Cir. 2000). There, the court observed that "we have rejected the claim that 'bad advice delivered verbally entitles plan participants to whatever the oral statement promised, when written documents provide accurate information.'" *Id.* at 586 (quoting *Frahm v. Equitable Life Assur. Soc. of U.S.*, 137 F.3d 955, 961 (7th Cir. 1998)). On the other hand, the *Bowerman* Court noted that it had "applied estoppel principles when countervailing ERISA principles would not be impeded and 'one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation.'" *Id.* (quoting *Gallegos v. Mount Sinai Med. Ctr.*, 210 F.3d 803, 811 (7th Cir.), *cert. denied*, 531 U.S. 827, 121 S.Ct. 76 (2000)). There was no suggestion in Bowerman that the misrepresentation on which the plaintiff relied had been made by the benefits administrator with intent to deceive.

Likewise, in *Miller v. Taylor Insulation Co.*, the court held that the defendant employer may be estopped to deny that its former president would remain a participant under the defendant's medical reimbursement plan after he retired. 39 F.3d 755 (7th Cir. 1994). Notwithstanding the absence of any evidence of intentional misrepresentation on the part of the defendant, the court held that the defendant's promise could be enforceable:

> The promise would be entirely hollow if Miller were excluded from all possibility of receiving benefits simply because he was not a full-time employee. He was retiring, ceasing to be a full-time employee, with no expectation of resuming full-time employment. And everyone knew this. The agreement promised him coverage regardless. So, if, as turned out to be the case, the insurance policy did not cover Miller, it became [defendant]'s duty either to obtain an amendment to the policy or to pay any benefits that might be due under the terms governing entitlement (other than the status of being a full-time employee) itself.

11

*Id.* at 758. Because the promise in that case, as the misrepresentation here, was written, the court also noted that "enforcing it would not collide with a policy against allowing oral modifications of ERISA plans." *Id.* at 759. The same is true here. And although *Miller* involved promissory estoppel, this makes no difference as "ERISA-estoppel can encompass both the concept of promissory estoppel and the concept of equitable estoppel." *Kamler v. H/N Telecommunication Services, Inc.*, 305 F.3d 672, 679 (7th Cir. 2002).

Based on *Bowerman* and *Miller*, it appears clear that Ms. Raebel's misrepresentation to Mr. Winkelspecht is the kind of knowing misrepresentation needed to support a claim of estoppel under ERISA. Ms. Raebel, as the Administrator of Payroll and Benefits for GALCO at the time, was the person GALCO employees were to go to for answers to questions about their benefits. At all relevant times, she was acting on behalf of the Plan administrator. Moreover, her representation to Mr. Winkelspecht was not a hurried or spontaneous response to an informal or casual inquiry about benefits. The record clearly demonstrates that Mr. Winkelspecht not only had an oral conversation with Ms. Raebel in which he asked her about continuing his life insurance, but he also asked her to confirm what she had told him in writing, which she did. He then placed the written confirmation along with the SPD into his safe. If this representation is insufficient to support a claim for estoppel, it is difficult to think of one that would. I therefore conclude on the basis of the undisputed evidence before me that Plaintiff has established that Mr. Winkelspecht reasonably relied on Ms. Raebel's representation.

In addition to reasonable reliance, a claim based on estoppel also requires a showing that the Plaintiff was harmed; the reliance must be detrimental. Under the facts of this case, this would require Plaintiff to show that, had Ms. Raebel accurately informed Mr. Winkelspecht that his life

12

insurance would expire if he did not apply to Unum and pay the premium, he would have made application and paid the premium himself. Ms. Yaeso, Plaintiff's daughter, noted in her email to Ms. Klein that she learned from her conversations with Unum that the premium to continue her father's coverage would have been approximately $226 per month. Ms. Yaeso stated that her parents could certainly have afforded to continue the coverage and would have done so to insure payment of the mortgage balance since that is what they were doing with another policy insuring her mother's life. (PSPFOF ¶ 9.) This evidence supports a finding of detrimental reliance, but GALCO does not challenge this element of the claim in any event. I therefore conclude the issue is waived. *See Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549 (7th Cir. 2002) ("A party waives any argument that it does not raise before the district court or, if raised in the district court, it fails to develop on appeal."). Accordingly, Plaintiff is entitled to summary judgment against GALCO and the Plan on her estoppel claim.

**2. Breach of Fiduciary Duty**

Plaintiff has also asserted a claim against GALCO for breach of fiduciary duty under ERISA. ERISA imposes standards of fiduciary duty including the fiduciary's duty to act "with the care, skill, prudence, and diligence" as would a prudent man under the same circumstances. 29 U.S.C. §§ 1104(a)(1)(B). A fiduciary must also fulfill his duties "with respect to a plan solely in the interests of the participant and beneficiaries." 29 U.S.C. §§ 1004(a)(1). To state a claim for a violation of a fiduciary duty, a plaintiff must establish: (1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff. *Brosted v. Unum Life Ins. Co. of America*, 421 F.3d 459, 465 (7th Cir. 2005). An ERISA

13

plaintiff suing for breach of a fiduciary duty, however, is limited to equitable relief. "Where it is clear that the plaintiff is seeking legal rather than equitable relief, dismissal of the claim may be appropriate." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010).

According to GALCO, there is no actionable breach of fiduciary duty in this case because Ms. Raebel "was not a fiduciary" and "because her misstatement was an honest mistake, i.e. it was made with no intent to deceive or mislead Mr. Winkelspecht." (ECF No. 30 at 8.) ERISA defines a fiduciary as a person who exercises discretionary authority or control over the management of a plan or its assets. 29 U.S.C. § 1002(21)(A). Responsibility for the day-to-day administration of a plan is not enough. 29 C.F.R. § 2509.75-8. The Seventh Circuit has provided similar guidance. *See, e.g.*, *Kannapien*, 507 F.3d at 639 (human resources manager who provided information about retirement plan was not a fiduciary); *Tegtmeier*, 390 F.3d at 1047–48 (ruling that an employee of a pension fund with day-to-day responsibilities for administering that fund was not a fiduciary).

But the fact that Ms. Raebel is not a fiduciary does not mean that GALCO could not have breached its fiduciary duty to Mr. Winkelspecht. As the Seventh Circuit ruled in *Kenseth*, a material misrepresentation by a non-fiduciary Plan representative nonetheless may violate the plan administrator's fiduciary duty of loyalty to the plan participant. 610 F.3d at 470. As a fiduciary, GALCO is obliged to carry out its duties with respect to the Plan "solely in the interest of the participants and benefits and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; . . . [and] (B) with the care skill, prudence, and diligence under the circumstance then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ." 29 U.S.C. § 1104(a)(1). GALCO thus owes the participants in its plan and their beneficiaries a duty

14

of loyalty like that borne by a trustee under common law, § 1104(a)(1)(A) and it must exercise reasonable care in exercising that duty, § 1104(a)(1)(B). *See also Mondry v. Am. Fam. Mut. Ins. Co.*, 557 F.3d 781, 807 (7th Cir. 2009), *cert. denied*, 130 S.Ct. 200 (2009).

Of course, ERISA does not hold benefit plans or plan administrators strictly liable for every misstatement. *Frahm v. The Equitable Life Assur. Soc'y*, 137 F.3d 955, 960 (7th Cir. 1998); *Conkright*, 130 S.Ct. at 1644. GALCO contends that a breach of fiduciary duty exists only when a fiduciary misstates the terms of a plan with an intent to deceive or mislead a beneficiary or participant. While there exists some authority that supports GALCO's understanding, *see Brosted*, 421 F.3d at 466; *Kannapien*, 507 F.3d at 639–40, the more recent cases make clear that intent to deceive is not required for breach of fiduciary duty. In *Kenseth*, the Seventh Circuit explained the tension between the two lines of cases addressing the issue:

> We read *Frahm* and its progeny to absolve a fiduciary of liability for negligent misrepresentations made by an agent of the plan to a plan participant or beneficiary so long as the plan documents themselves are clear and the fiduciary has taken reasonable steps to avoid such errors. Kenseth's claim, which is premised on the ambiguity of the Certificate and on Dean's lack of care in training the customer service representatives from whom it has encouraged plan participants to seek coverage information, describes a type of fiduciary negligence that these cases recognize as actionable.

610 F.3d at 470; *see also Bowerman*, 226 F.3d at 590–91. Thus, "although negligent misrepresentations are not themselves actionable, the failure to take reasonable steps to head off such misrepresentations can be actionable." *Kenseth*, 610 F.3d at 471.

In this case, the SPD did not specify how a participant was to go about applying to "port" his insurance coverage, and Ms. Raebel's error went beyond a failure to communicate material facts. She did not merely provide partial information or omit t important details; rather she falsely assured

15

Mr. Winkelspecht his coverage would continue when instead it would automatically cease. Mr. Winkelspecht could not have gleaned this falsehood from the Plan itself, as his issue was not a misunderstanding of how coverage works but rather an inquiry into who paid for the premium. Based on Ms. Raebel's written representation, Mr. Winkelspecht would have reasonably believed that his life insurance through Unum remained in effect after his retirement. *See, e.g.*, *Bowerman*, 226 F.3d at 591 ("Both [the administrative assistant] and the service representative failed to provide accurate and forthright answers to [participant's] queries about her coverage in general and her need to obtain COBRA coverage.").

GALCO tries to escape liability on this front in part by arguing that Ms. Raebel was not in a position to act in this fashion on behalf of the company. But to the extent that Ms. Raebel was unprepared to make these sorts of decisions, that fault belongs to GALCO alone, as it was responsible for hiring and training her. Plan fiduciaries have an obligation to anticipate inquiries and to select and train personnel accordingly. "The fiduciary satisfies that aspect of its duty of care by exercising appropriate caution in hiring, training, and supervising the types of employees (e.g., benefits staff) whose job it is to field questions from plan participants and beneficiaries about their benefits. *Frahm*, 137 F.3d at 960; *see also Brosted*, 421 F.3d at 466; *Schmidt*, 128 F.3d at 547–48.

Ms. Raebel was hired as Administrator of Payroll and Benefits through a temporary service in December 2006 but was never made a permanent employee of GALCO. (PPFFOF ¶ 42.) While Ms. Raebel had substantial experience working with employee benefits and insurance, she did not have any formal training nor did she have a degree in human resources. (PPFFOF ¶ 43.) When Ms. Raebel was hired in December 2006 she was trained by (then) Administrator of Payroll and Benefits, Nicolette Rappl (now Mutzenbauer). (PPFFOF ¶ 44.) The training consisted of "a week

or two" of learning the payroll system, processing payroll, learning a human resources software program, and being advised as to the different benefit plans offered at GALCO. (PPFFOF ¶ 45.) There is no indication Ms. Raebel received any further education or training during her employment at GALCO. Ms. Klein contends she determined, at the outset of Ms. Raebel's employment, that Ms. Raebel had "a good understanding" of the GALCO plan. (PPFFOF ¶ 55.) But Ms. Klein herself was unaware how insurance premiums were determined or how they were paid. (PPFFOF ¶ 57.) Ms. Klein did not know how to communicate to Unum that an employee was no longer covered under the GALCO Plan. (PPFFOF ¶ 58.) Ms. Klein also incorrectly believed that after Mr. Winkelspecht's retirement, GALCO could not continue to pay his life insurance premium because he could not continue his life insurance as part of the GALCO Group Plan. (PPFFOF ¶ 59.) Ms. Klein was able to identify that there were two options for life insurance, but conceded, even after having time to review the Plan, "I don't think I could give you a very good explanation of either one." (PPFFOF ¶ 61.)

Furthermore, GALCO had no written policies or procedures in place regarding the administration of the Plan. (PPFFOF ¶ 72.) It had no written instructions prepared for employees. (PPFFOF ¶ 73.) Other than Ms. Rappl (who was out on maternity leave) no one else from GALCO associated with the Plan was aware of a particular application form for the Portability Benefit that could be provided by Unum. Having held Ms. Raebel out as its representative, GALCO is responsible for her written representations of coverage, particularly in light of the fact that her emails contained no warning that her statements were not binding on the company. *See Kenseth*, 610 F.3d at 469 ("[Callers] were not warned that they could not rely on the advice that they were given by Dean's customer service representatives and that Dean might later deny claims for services

17

that callers had been told would be covered. Nor were callers advised of a process by which they could obtain a binding determination as to whether forthcoming services would be covered. The factfinder could conclude that Dean had a duty to make these disclosures so that participants could make appropriate decisions about their medical treatment.").

From the undisputed facts before me, I conclude that GALCO breached its fiduciary duty to Mr. Winkelspecht. It is unclear, however, what if any relief Plaintiff might be entitled to as a result of such a breach. While § 1132(a)(3) does permit a plan beneficiary to seek redress in her own behalf for breach of fiduciary duty, it limits the type of relief available. "[I]t allows only injunctive and 'other appropriate equitable relief'; compensatory damages and other forms of legal relief are beyond the scope of the relief authorized." *Kenseth*, 610 F.3d at 482 (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993)). Because this issue has not been fully addressed by the parties, I am unable to grant Plaintiff relief on this claim.

## C. Unum

Plaintiff's claims against Unum fails because at the time of her husband's death, he was not insured under the Unum group policy, and there is no evidence that would support a claim of estoppel or breach of fiduciary duty against it. Unum's liability is governed by the terms and conditions of its policy. Mr. Winkelspecht's eligibility for group coverage under the policy terminated with his employment at GALCO. Although the policy allowed employees to "port" or convert the group coverage to individual coverage upon cessation of employment, in order to do so they were required to submit an application and pay a premium. Here, it is undisputed that Mr. Winkelspecht did not submit an application and no premium was paid. It thus follows that at the

18

time of his death he was no longer insured by Unum. Plaintiff's claim for benefits due under the policy therefore fails.

Plaintiff's claims for estoppel and breach of fiduciary duty against Unum likewise fail. The estoppel claim fails because Ms. Raebel was GALCO's employee, not Unum's. The representation she made to Mr. Winkelspecht which allegedly induced his detrimental reliance was not attributable to Unum. And the claim for breach of fiduciary duty against Unum fails because Unum was not the plan administrator; GALCO was. It was GALCO that was responsible for responding to Mr. Winkelspecht's questions and it was GALCO, through its benefits administrator, that mislead him. Under these circumstances, Plaintiff has no claim against Unum. Unum's motion for summary judgment will therefore be granted.

## CONCLUSION

For the reasons set forth above, Unum's motion for summary judgment is **GRANTED**. Plaintiff's motion for summary judgment against GALCO and the Plan is **GRANTED** on her claim for estoppel, but **DENIED** on the alternative grounds. GALCO's motion is **DENIED** in its entirety. The parties are to advise the Court within the next ten days whether any issues remain before entry of judgment.

**SO ORDERED** this   8th   day of March, 2012.

                                                s/ William C. Griesbach
                                                William C. Griesbach
                                                United States District Judge